# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-14-00413-CR

Priscilla Aguilar Hernandez, Appellant

v.

The State of Texas, Appellee

FROM THE DISTRICT COURT OF MCCULLOCH COUNTY, 452ND JUDICIAL DISTRICT
NO. 5797, HONORABLE ROBERT R. HOFMANN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Priscilla Aguilar Hernandez was charged with murdering her husband Jimmie Hernandez.[1]  *See* Tex. Penal Code § 19.02(b) (setting out elements of offense).  A self-defense instruction was included in the jury charge for the guilt or innocence portion of the trial.  The jury found Priscilla guilty.  During the punishment phase, a sudden-passion instruction was included in the jury charge, *see id.* § 19.02(a)(2) (defining "[s]udden passion"), .02(d) (allowing defendant to raise issue of sudden passion during punishment portion of trial and reducing severity of offense to second-degree felony if jury finds that defendant committed offense due to sudden passion), but the jury determined that sudden passion did not apply and sentenced Priscilla to 30 years' imprisonment, *see id.* § 12.32 (providing permissible punishment range for first-degree felony).

---

[1] Because the defendant and the victim share the same last name, we will refer to them by their first names.

In two issues on appeal, Priscilla contends that the "evidence is factually insufficient to support the jury's negative finding on the sudden passion issue contained in the trial court's charge on punishment" and that the evidence is "insufficient to support the jury's rejection of [her] self-defense claim." We will address Priscilla's second issue first and, after considering both issues, affirm the district court's judgment of conviction.

## BACKGROUND

Although some of the events leading up to the offense at issue are contested, the following facts are undisputed. Priscilla met Jimmie when she was a minor, and she married Jimmie after her parents gave their consent to the marriage. During their relationship, Priscilla and Jimmie used illegal drugs and drank alcohol regularly. At various points, Priscilla and Jimmie had people staying with them for extended periods of time, including a mutual friend, Mary Bennett; one of Jimmie's cousins, Michael Acosta; and Acosta's mother, Ermalinda Duarte. When Acosta was living with Priscilla and Jimmie, he was a minor. At some point after Acosta moved in and while he was still a minor, Priscilla and Acosta entered into a sexual relationship and continued some type of romantic relationship up until the day of the offense. Prior to the offense, Acosta moved out of the house, and Priscilla and Jimmie separated. After their separation, Priscilla moved into a new home with her and Jimmie's daughter, and Jimmie paid the rent on the home. Although they were separated, Jimmie lived with Priscilla for part of the time and with his parents for the remainder of the time.

On the night of the offense, Priscilla's half brother, Justin Stone, and his girlfriend, Staci Leach, were staying at Priscilla's home. During the visit, Stone, Jimmie, and Priscilla drank

alcohol, but Leach did not drink because she was pregnant; however, Leach did smoke marijuana at various points throughout the day. At some point early in the evening, Stone and Leach fell asleep on the couches in Priscilla's living room. After Stone and Leach went to sleep, Priscilla and Jimmie decided to go out for the evening with Jimmie's parents, and Priscilla and Jimmie continued to drink throughout the evening. At the end of the evening, Jimmie's parents offered to drive Priscilla and Jimmie home. Priscilla accepted their offer, but Jimmie decided that he would rather walk home.

After Priscilla arrived home, she left the home and walked to meet Jimmie outside. When Priscilla met Jimmie, some kind of conflict ensued, and the pair ultimately returned to the home. While they were in the house, Leach woke up after hearing Priscilla and Jimmie argue. During the argument, Priscilla stabbed Jimmie in the chest. Leach witnessed Priscilla stab Jimmie. After being stabbed, Jimmie went outside and died in the front of the house. Prior to the police arriving on the scene, Priscilla fled the premises. After talking with her parents the following day, Priscilla agreed to turn herself in. Ultimately, Priscilla was charged with and convicted of murder.

## DISCUSSION

**Self-Defense**

In her second issue on appeal, Priscilla challenges the sufficiency of the evidence supporting "the jury's rejection of [her] self-defense claim."[2]

---

[2] In her brief, Priscilla argues that the "evidence is factually insufficient to support the jury's rejection of her self-defense claim" and seeks relief that is consistent with a factual-sufficiency challenge. However, as explained in the body of the opinion, challenges to the sufficiency of the evidence supporting a jury's rejection of a self-defense claim are reviewed under the legal-sufficiency standard.

3

Under the Penal Code, an individual is guilty of the crime of murder if she "intentionally or knowingly causes the death of an individual." Tex. Penal Code § 19.02(b)(1). However, the Code also states that an individual "is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force," *id.* § 9.31(a), but the Code specifies that the "use of force against another is not justified: (1) in response to verbal provocation," *id.* § 9.31(b)(1). Furthermore, the Code provides that an individual "is justified in using deadly force against another . . . if the actor would be justified in using force against the other" and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a). "'Deadly force' means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3).

Self-defense is a fact issue for the jury to determine, and if the jury enters a verdict of guilty, it implicitly rejected the theory of self-defense. *Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991). For self-defense claims, the defendant has the burden of producing some evidence to support the claim. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *see also id.* (contrasting self-defense from affirmative defenses and explaining how burdens shift for self-defense). If the defendant produces some evidence, the State has "the burden of persuasion to disprove the raised defense." *Id.* at 594. The State's burden does not require the production of any additional evidence; instead, "it requires only that the State prove its case beyond a reasonable doubt." *Id.*; *see Saxton*, 804 S.W.2d at 913. "Because the State bears the burden of persuasion to disprove a" claim of self-defense "by establishing its case beyond a reasonable doubt, we review

4

both legal and factual sufficiency challenges to the jury's rejection of such a defense under" the legal-sufficiency standard. *See Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *cf. Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (providing that "legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense").

Under that standard, appellate courts view the evidence in the light most favorable to the verdict and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When performing this review, an appellate court must bear in mind that it is the factfinder's duty to weigh the evidence, to resolve conflicts in the testimony, and to make reasonable inferences "from basic facts to ultimate facts." *Id.*; *see also* Tex. Code Crim. Proc. art. 36.13 (explaining that "jury is the exclusive judge of the facts"). Moreover, appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Furthermore, appellate courts presume that conflicting inferences were resolved in favor of the conviction and defer to that resolution. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "When reviewing a legal-sufficiency challenge on the issue of self-defense, a reviewing court views the evidence in the light most favorable to the verdict to see if any rational trier of fact could have found (1) the essential elements of murder beyond a reasonable doubt, and (2) against appellant on the self-defense issue beyond a reasonable doubt." *Hernandez v. State*, 309 S.W.3d 661, 665 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *see Armour v. State*, No. 03-13-00250-CR,

5

2015 Tex. App. LEXIS 2328, at *3 (Tex. App.—Austin Mar. 12, 2015, no pet.) (mem. op., not designated for publication).

In contesting the sufficiency of the evidence, Priscilla relies on her testimony from trial regarding her recollections of the events leading up to the offense as well as her reasons for stabbing Jimmie. In particular, Priscilla discussed in her testimony various instances of past abuse in which Jimmie allegedly hit her, choked her, dragged her by the hands, threw her against a wall, and "blew boogers on my face." Moreover, she related that she decided to separate from Jimmie because of these incidents. Regarding the night of the offense, Priscilla testified that she and Acosta were texting one another, that some of the texts were romantic in nature, and that Jimmie was aware of the texting. Further, she related that she was drinking that night, that Jimmie was intoxicated, that Jimmie got angry at some point in the evening, that Jimmie called her a "F'ing bitch," that she walked back to meet Jimmie after his parents dropped her off at her home, and that after she met Jimmie, the following occurred:

> He didn't say anything then. He walked straight to me, picked me up by my hoodie, threw me across the street, and he started walking towards me. So I kicked at him, and he grabbed my boot -- he grabbed my foot. And when he twisted it, it pulled my boot off. So he turned to throw my shoe. I got up and I started yelling at him, telling him to turn around, don't go to my house, and he told me he would go wherever he wanted to go.
>
> And I kept telling him to go to his mom's. I would walk him there. And he just wasn't listening, and so we stood there yelling for a little while.
>
> . . .
>
> And then he punched me in the eye. And when he did that, I started yelling even more, and I yelled at him for punching me, and he hit me in the head, and I started backing up when I was yelling.

6

. . .

He spit in my face, and then I hit him in the mouth.

Furthermore, Priscilla testified that she ran for the house, that Jimmie arrived a minute later, that she told Leach what happened and asked her to wake Stone up, that Jimmie started yelling, that Jimmie pushed her when Leach was not looking, that she grabbed a pan as she was falling, that she hit Jimmie with the pan when she got up, that she kept telling Jimmie to leave while she was hitting him, that she hit him two or three times with the pan, that Jimmie threw a knife "at my feet," and that she picked up the knife. Next, she explained that she stabbed Jimmie with the knife when he came towards her, that she did not intend to kill him, and that she was afraid that her life was in danger. In addition, she testified that after she stabbed Jimmie, she let go of the knife. Moreover, she stated that after Stone woke up and went to check on Jimmie outside, she realized that "Jimmie was actually hurt," that she "ran outside," and that she saw "blood everywhere." Priscilla also explained that she told Jimmie that she was sorry, that he said that he was sorry, that he told her to run after he heard that Leach and Stone were calling the police, that she ran, and that she spent the night under a bridge.

In addition to her testimony, two signed statements that Priscilla gave to the police after the offense were admitted as exhibits and portions of the first statement were introduced through the testimony of Texas Ranger Dwayne Goll, who responded to the 911 call and later took Priscilla's statement. In Priscilla's first statement, she communicated that she went out with Jimmie on the night of the offense, that they continued drinking after going out, that Jimmie got angry at her, that Jimmie called her "a bitch and [told] me to go see my boyfriend," that Jimmie walked home,

7

that she met Jimmie outside, that Jimmie started yelling, that Jimmie threw her down, that she started kicking Jimmie, that Jimmie removed her boot, that Jimmie started hitting her in the face, that she hit him in the mouth and made his lip bleed, and that Jimmie started spitting on her. In the statement, Priscilla also related that after going inside the house, she attempted unsuccessfully to wake her brother up, noticed a pan in the kitchen, and used the pan to hit Jimmie in the back of the head twice. Regarding the offense, Priscilla recalled in her statement that Jimmie threw a knife at her and that when he threw it a second time, she picked it up and stabbed him. Specifically, she wrote that "I did not intend to stab him when the knife came out. To me I did not swing it. I just went like that, and I turned around and stabbed him." In addition, Priscilla informed the police that she told Jimmie that she was sorry, that Stone told her to leave, that she left the house and started walking, and that she turned herself in hours later. Finally, Priscilla explained in her statement that "[i]t was not really unusual for Jimmie to hit me," that she thought this incident happened because everyone was very drunk, and that at the time of the offense, she and Jimmie were both seeing other people and were only living together for the sake of their young daughter.

In addition to pointing to her own testimony regarding her history with Jimmie and regarding the events at issue, Priscilla also relies on testimony from individuals who observed her prior interactions with Jimmie as support for the idea that Jimmie was physically abusive, that Jimmie initiated the conflict on the night in question, and that she feared for her life when she stabbed Jimmie. Specifically, she points to the testimony of her mother, Diane Aguilar, who explained that on two prior occasions Priscilla told her that Jimmie had hit her and had thrown "snot on her." In addition, Priscilla refers to the testimony of Duarte in which Duarte explained that during the time

8

that she lived with Jimmie and Priscilla, she heard Jimmie threaten to kill Priscilla and saw Jimmie physically assault Priscilla. Moreover, Duarte also testified that Jimmie called her home on the night of the offense looking for Acosta, that Jimmie was intoxicated when he made the call, and that Jimmie threatened to kill Acosta during the call because of his affair with Priscilla.

During the trial, Acosta also testified regarding his observations from the time that he was living with Jimmie and Priscilla. Specifically, he stated that he heard Priscilla and Jimmie argue regularly and saw them hit one another; however, Acosta clarified that he only saw Priscilla hit Jimmie after Jimmie hit her first. Moreover, Acosta characterized Jimmie and Priscilla's relationship as unstable, described Jimmie as the aggressor, and recalled that he feared for Priscilla's life when Jimmie got violent. Furthermore, he testified that on the night of the offense, he and Priscilla were exchanging texts that were sexual in nature and that at some point in the evening, Jimmie became aware that the texts were being exchanged.

In addition to the testimony above, Aguilar and Priscilla's aunt, Rosalinda Mendez, both testified regarding their interactions with Priscilla after the offense. In her testimony, Mendez explained that when she saw Priscilla after the incident, Priscilla had bruises on one of her cheeks and on her back and had what looked to be "the beginning of a black eye." Furthermore, Mendez stated that Priscilla told her that Jimmie "hit her and that he was kicking her."[3] Similarly, Aguilar testified that when she saw Priscilla on the day after the offense, Priscilla had bruises on one of her wrists and on one of her eyes.

---

[3] In her testimony, Mendez also explained that she talked with Leach after the offense, that Leach told several different versions of the events leading up to the stabbing, and that in one of those versions, Leach said that Priscilla tried to get away from Jimmie before she stabbed him but that Jimmie threw a knife at Priscilla and told Priscilla to "try this" knife.

Finally, when making her sufficiency challenge, Priscilla refers to testimony from Dr. Lisa Watts, who discussed battered-women's syndrome and post-traumatic stress disorder and described how those conditions might have been in play during the offense. Specifically, Dr. Watts diagnosed Priscilla as suffering from both conditions, described prior physical altercations that allegedly occurred between Priscilla and Jimmie, revealed sexual abuse that Priscilla had experienced in her life that was committed by individuals other than Jimmie, and stated that based on her review of this case and of Priscilla's history, she did not believe that Priscilla intended to kill Jimmie; on the contrary, Dr. Watts surmised that Priscilla "was just trying to protect herself and remove the immediate danger." In addition, Dr. Watts testified that she believed that Priscilla was afraid for her life on the night of the offense. Moreover, Dr. Watts explained that it was not uncommon for individuals suffering from post-traumatic stress disorder to forget details of traumatic events and to appear unemotional after an event.

However, in addition to the testimony from Priscilla regarding the offense at issue, the State called Leach to the stand to testify regarding what she witnessed on the night of the offense. When describing Priscilla and Jimmie's relationship, Leach stated that they "seemed happy for the most part" but that she had observed them argue before.[4] Regarding the night in question, Leach mentioned that she asked Priscilla about some hickeys on her neck and that Priscilla admitted that

---

[4] During the trial, the signed statement that Leach gave to the police shortly after the offense was admitted as an exhibit. In her statement, Leach explained that during the two years that she had known Jimmie and Priscilla, she saw them engage in physical fights. Moreover, Leach said that she saw "Jimmy slap Priscilla twice that I can recall," but she also explained that "[m]ost of the time Jimmy would not touch Priscilla and she would hit him." In her testimony during trial, Leach explained that when she saw Jimmy slap Priscilla, "He was playing. He wasn't doing that out of aggression. He was rough-housing."

10

someone other than Jimmie had given them to her. Next, she stated that after she fell asleep on the sofa in Priscilla's home, she woke up when she heard Priscilla and Jimmie arguing, and Leach testified that she saw Priscilla come in the front door followed by Jimmie. Moreover, Leach explained that Priscilla told her that Jimmie "had hit her or something and she was missing a boot, and she was yelling at him because" he threw her boot. Furthermore, Leach recalled that it looked like someone had spit around Priscilla's eyebrow and that there was blood in the spit. When describing her interactions with Jimmie, Leach explained that she asked him if he hit Priscilla and that Jimmie said that he "did not lay a hand on her" but did admit that he spit on Priscilla.

After discussing her conversation with Jimmie, Leach revealed that she watched Jimmie and Priscilla go into the kitchen, heard them continue their argument, and observed Priscilla pick up a pan and start hitting Jimmie in the head multiple times with it. Moreover, Leach explained that Jimmie did not try to hit Priscilla back and, in fact, "did not raise his hand to her at all" or threaten her in any way during the entire encounter. Next, Leach revealed that she saw Priscilla grab "a handful of knives" from nearby in the kitchen and said that after Priscilla grabbed the knives, Jimmie attempted to leave the kitchen and come back to the living room. Further, Leach stated that when Jimmie was attempting to leave the kitchen, Priscilla "threw one knife at him and it stuck in the ground in the floor, and he picked it up by the blade and told her, "[']you missed me, Bitch, try again.[']" When describing that statement, Leach explained that Jimmie did not yell the statement or move toward Priscilla. Next, Leach testified that Jimmie handed the blade back to Priscilla and that when he handed the knife back, he held the knife by the blade.[5] Furthermore, Leach recalled that

---

[5] During cross-examination, Leach admitted that she initially told Priscilla's investigator that Jimmie threw the knife on the table. Leach made a similar claim in her signed statement that she

after Jimmie returned the knife, he and Priscilla continued to argue and that when Priscilla turned to walk away, Jimmie "told her to go fuck another kid." In addition, Leach explained that after Jimmie made that statement, Priscilla held the knife high above her head, turned around, stabbed Jimmie in the chest, backed up, and said, "ha, Bitch." When describing the offense, Leach stated that she saw Priscilla walk away, saw Jimmie pull the knife out, watched Jimmie walk outside, and heard Jimmie say "don't call the cops."

Regarding the events that occurred after the offense, Leach explained that she went outside to see if she could help and that after she went outside, Priscilla ran outside, grabbed Jimmie's arm, and "was trying to jerk him up like get him to set up or something"; however, Leach also revealed that Jimmie did not move or say anything. Furthermore, Leach testified that Priscilla

---

gave to the police shortly after the offense. The remainder of the written statement is generally consistent with her testimony and provides, in relevant part, as follows:

> Priscilla was yelling "you threw my fucking boot in the street!" Jimmy kept repeating "no I didn't, no I didn't!" They went in the kitchen . . . . Priscilla was beating the hell out of Jimmy in the kitchen. She was punching him in the face and hitting him in the head with a metal pan . . . . Priscilla picked up three or four knives and dropped all of them except the one with the black handle and went toward Jimmy with it and then threw it at him and missed him and it stuck in the floor by the sink. . . . Then Jimmy picked up the knife and told Priscilla, "you missed me try again[,]" and threw the knife on the table. After Jimmy threw the knife on the table he stood in front of the door and was facing me and told·me to try to get Priscilla to stop. . . . I got up and was trying to wake [Stone] up and was shaking him. When I turned around because Jimmy and Priscilla were yelling louder. Jimmy said, "Go Fuck another kid!" . . . They were facing each other in front of the door, the glass door, then Priscilla stabbed Jimmy in the chest. Priscilla had the knife Jimmy threw on the table in her left hand and raised the knife about to her shoulder and then stabbed Jimmy in the center of the chest and said "Ha". . . . I asked Jimmy if he wanted me to call the police, Jimmy said no. . . . Priscilla kicked the knife toward the kitchen by the couch. Priscilla did a sarcastic "Huh Huh" and said "Bitch" when she kicked the knife.

12

kept saying that she was sorry and was freaking out. In addition, Leach testified that Priscilla came back in the house to try to get Stone to wake up and that Priscilla kicked the knife under the couch[2]; however, Leach explained that she did not know if Priscilla kicked the knife intentionally or not. Next, Leach explained that Stone told Priscilla that he was going to call the cops and that Priscilla said that she would wait for the cops to arrive but that after Stone went inside to make the call, Priscilla disappeared.

In addition to the testimony from Leach regarding the events that she witnessed, the State also called Bennett to the stand to discuss her observations of Priscilla and Jimmie's relationship.[3] In her testimony, Bennett described Jimmie as "real calm and quiet" and said that he was not a violent person. Furthermore, although she admitted that she saw Jimmie and Priscilla argue, she testified that Priscilla was the aggressor and started the arguments. In addition, Bennett related that she had been around Jimmie and Priscilla when they were drinking and that Priscilla loses her temper when she drinks. During her testimony, Bennett also explained that she was only aware of one physical altercation between Jimmie and Priscilla and agreed that Priscilla had sustained injuries during the altercation, but Bennett reaffirmed that Priscilla was the aggressor in the relationship.

In light of the evidence summarized above, there were conflicts in the evidence regarding not only the events immediately preceding the stabbing but also regarding whether Priscilla

---

[2] Officer Goll testified that he later found the knife "halfway underneath the couch."

[3] When she was testifying, Bennett explained that in the past she sold Jimmie and Priscilla drugs and that when she lived with Jimmie and Priscilla, the three of them used illegal drugs together. However, in her testimony, she also stated that she has been sober for years now.

or Jimmie was the aggressor in their relationship, and the resolution of those conflicts turned on the weight and the credibility that the jury chose to give to the testimony and evidence presented during the trial. In resolving the conflicts between Priscilla's and Leach's testimonies regarding the offense, the jury was aided by other portions of Priscilla's testimony. Specifically, in her testimony, Priscilla admitted that she has a temper and will get mean if she drinks and further admitted that she was intoxicated on the night that Jimmie died. In addition, she recalled that Jimmie did not hit her in the house prior to her stabbing him and instead "just pushed" her. Moreover, Priscilla acknowledged that she signed the statements that she gave to the police after the offense in which she stated that she was drinking on the night that she stabbed Jimmie and that when she drinks and gets mad, she can get violent.[4]

Furthermore, the jury also had the benefit of examining the signed statements that Priscilla made to the police. In a portion of her second statement, Priscilla explained that "Jimm[ie] handed me the knife . . . and I threw it and Jimm[ie] picked it up and gave it back to me and that's when I stabbed him. I don't know why I stabbed him." In addition, she explained that "When I'm drunk I'm usually fine until somebody sets me off and I get out of hand then. I get mean. Whenever I'm drinking everything gets to me. Everything just piles up on my mind. Jimm[ie] set me off the night of the stabbing."

In addition, the jury was aided by the testimony from Priscilla and Leach showing that Priscilla left the scene of the offense, *see Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App.

---

[4] In her testimony, Priscilla acknowledged that she signed the written statements, but she denied that she ever stated that she gets violent after drinking. However, Priscilla admitted that she made modifications to other portions of her statements to correct inaccuracies.

14

2011) (explaining that flight can support inference of guilt), and from the portion of Priscilla's testimony in which she admitted that after she fled, she made no attempt to check on Jimmie or otherwise inquire about him until hours later when she called her father. Furthermore, when deciding what weight to give the conflicting testimonies, the jury was aware that many of the individuals who testified that Jimmie had previously assaulted Priscilla were either related to Priscilla or had been in a romantic relationship with her, and the jury was also aware that Leach was dating Priscilla's brother at the time of the offense and was still dating him at the time of the trial when she testified for the State. In addition, the jury heard testimony from Officer Goll and Deputy Sheriff Connie Baker regarding Priscilla's demeanor during their conversations with her after the offense. In particular, Officer Goll stated that Priscilla "was pretty matter of fact, and we went through the questions and answers pretty easily," and Officer Baker testified that when Priscilla modified her statement that she initially made to the police, Priscilla did not appear to be expressing any remorse. In addition, Officer Goll explained that he photographed and examined Priscilla's hands to see if there were any defensive wounds but that there were no wounds on her hands.

When resolving the inconsistencies in the evidence, the jury was also guided by testimony from Priscilla, Aguilar, and Officer Baker regarding Priscilla's prior conviction for domestic violence stemming from an incident in which she assaulted her younger brother. Regarding the incident, Priscilla recounted that she became intoxicated and fought with her younger brother at her mother's house, and she also explained that she attempted to throw a rock at the house in order to break a window and get in the home. Similarly, Aguilar testified that Priscilla hit her younger brother when she was intoxicated. Further, Officer Baker explained that after she arrived on the scene, she arrested Priscilla for public intoxication and for assault family violence.

15

Finally, the jury was aided by Dr. Watts's acknowledgment that much of her opinion regarding Priscilla was based on information that she obtained from Priscilla and that her conclusions were premised on Priscilla being truthful in her answers.

By finding Priscilla guilty, the jury determined that Priscilla intentionally or knowingly caused Jimmie's death by stabbing him and that Priscilla's actions were not justified by a reasonable belief that deadly force was immediately necessary to protect her against Jimmie's use or attempted use of unlawful deadly force. *See* Tex. Penal Code §§ 9.31(a), (b)(1), 19.02(b)(1). Given that courts reviewing a legal-sufficiency challenge consider the evidence in the light most favorable to the verdict and bearing in mind the jury's role in weighing and resolving inconsistencies in the evidence, we must conclude that a rational jury could have found that the State proved each element of the offense of murder beyond a reasonable doubt and also found beyond a reasonable doubt that Priscilla's conduct was not justified self-defense. Accordingly, we conclude that the evidence is sufficient to support Priscilla's conviction and overrule her second issue on appeal.

**Sudden Passion**

In her first issue on appeal, Priscilla contends that the "jury's negative answer to the sudden passion issue in the trial court's punishment charge is" not supported by factually-sufficient evidence. When presenting this sufficiency challenge, Priscilla urges that the evidence presented at trial demonstrated that a "physical altercation . . . took place" outside of Priscilla's home and that "a mutual combat situation where tempers flared and emotions were running extremely high" occurred in the house. Furthermore, Priscilla asserts that even under Leach's version of the events, Priscilla "turned around to walk away" after Jimmie handed Priscilla the knife and told her to try

16

again, but then Jimmie told Priscilla "to go fuck another kid." When characterizing this exchange, Priscilla contends that Jimmie's statement was the provoking event that caused her to stab him. Moreover, Priscilla argues that the evidence is insufficient because no evidence was introduced indicating any type of premeditation on the part of Priscilla that would mitigate against a sudden-passion finding. In addition, Priscilla asserts that the evidence regarding events occurring after the stabbing is consistent with a determination that her actions were made while she was "under the influence of sudden passion." Specifically, she points to the testimony indicating that she became upset after she realized Jimmie was really hurt, that she told Jimmie that she was sorry and tried to help him get up, and that Jimmie told Leach not to call the cops.

The Penal Code explains that during the punishment phase of a murder trial, "the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause." Tex. Penal Code § 19.02(d). The Code defines "sudden passion" as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation" and "adequate cause" as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a). "Sudden passion must arise at the time of the offense and cannot result solely from former provocation." *Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). In addition, "neither ordinary fear nor anger alone is sufficient to establish sudden passion." *De Leon v. State*, 373 S.W.3d 644, 650 (Tex. App.—San Antonio 2012, pet. ref'd). Moreover, a "defendant must prove that the homicide

17

occurred while the passion still existed and before there was reasonable opportunity for the passion to cool." *Moncivais*, 425 S.W.3d at 407. Generally speaking, if the State's evidence is sufficient to overcome a claim of self-defense, the evidence will also be sufficient to show the absence of sudden passion. *Chavez v. State*, 6 S.W.3d 56, 65 (Tex. App.—San Antonio 1999, pet. ref'd); *see Wooten v. State*, 400 S.W.3d 601, 609-10 (Tex. Crim. App. 2013) (providing that if jury rejects defendant's claim that deadly force was immediately necessary, it is unlikely that jury would accept claim that victim's actions were adequate to elicit level of fear needed to make person of ordinary temperament lose control).

"The defendant has the burden of production and persuasion with respect to the issue of sudden passion." *Wooten*, 400 S.W.3d at 605. A "jury's adverse finding" on an affirmative defense is factually insufficient if the finding is against the great weight and preponderance of all of the evidence in the record. *Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013). When performing a factual-sufficiency review "of a rejected affirmative defense," reviewing courts "view the entirety of the evidence in a neutral light, but it may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony." *Id.*

As detailed in the prior issue, during the guilt or innocence portion of the trial, evidence was presented establishing that Jimmie and Priscilla had a physically tumultuous relationship, and contradictory evidence was introduced regarding who the aggressor in the relationship was. Also, evidence was presented establishing that Jimmie and Priscilla were intoxicated on the night of the offense. In addition, Priscilla testified that after she walked to meet Jimmie outside, Jimmie

18

assaulted her and that in response, she hit Jimmie in the mouth. Moreover, although Priscilla said that they continued the argument after going inside and that Jimmie pushed her once while they were inside, she admitted that Jimmie did not hit her while they were in the house, but Priscilla testified that she hit Jimmie with a pan multiple times inside the home. Furthermore, although Priscilla stated that Jimmie threw a knife at her feet and that she picked up the knife and stabbed Jimmie when he came towards her, Priscilla explained in her statement to the police that "Jimm[ie] handed me the knife . . . and I threw it and Jimm[ie] picked it up and gave it back to me and that's when I stabbed him. I don't know why I stabbed him." Moreover, Priscilla explained in her statement to the police that she gets "mean" when she drinks and that Jimmie "set [her] off" on the night of the offense.

When describing her observations that night, Leach explained that while Priscilla and Jimmie were in the house, Jimmie did not threaten or hit Priscilla, that Priscilla hit Jimmie with a pan several times, that Priscilla was the one who grabbed the knife, that she threw the knife at Jimmie, that he handed the knife back to Priscilla while holding the blade, that Priscilla and Jimmie continued to argue, that Priscilla turned to walk away, and that Priscilla stabbed Jimmie after he told "her to go fuck another kid." Furthermore, although Priscilla testified that she told Jimmie that she was sorry after realizing that she had seriously injured him and attempted to help get him up, Priscilla fled the home after the police were called and made no attempt to check on Jimmie until several hours later when she called her father, and Officers Goll and Baker stated that when Priscilla provided statements to the police, she "was pretty matter of fact" and did not seem to be expressing any remorse. Moreover, evidence was presented establishing that Priscilla had previously been convicted of assaulting a family member after becoming intoxicated.

19

During the punishment phase, Priscilla recalled Dr. Watts to the stand. In her testimony, Dr. Watts repeated her testimony from the guilt or innocence portion of the trial in which she explained that Priscilla was the victim of domestic violence, that Priscilla was suffering from post-traumatic stress disorder, that she had been sexually abused by individuals other than Jimmie and that Priscilla had a history of substance abuse. Furthermore, Dr. Watts explained that it was her opinion that Priscilla's stabbing of Jimmie was a sudden act that arose from the argument. Moreover, she related her belief that Priscilla "was reacting more from a physiological response from a place that was protective in nature and from a place that was very much in the moment. I do not believe it was premeditated or thought through, but more purely just a physiological response. . . . I think she viewed Mr. Hernandez as the aggressor toward her and responded in a way that was protective and immediate and impulsive." Next, Dr. Watts detailed her opinion that Priscilla was not acting rationally at the time and that had she been thinking rationally, there were other steps that Priscilla could have taken to end the conflict. In addition, she explained that it was her opinion that the high degree of conflict between Jimmie and Priscilla prior to the stabbing resulted in Jimmie's death.

However, Dr. Watts again admitted that her assessment was based on the information that Priscilla gave her and was made on the assumption that Priscilla was telling the truth. In addition, although Dr. Watts testified that she did not believe that Priscilla had the intent to kill, Dr. Watts agreed that it was possible that Priscilla wanted to kill Jimmie when she stabbed him. Moreover, when questioned about Priscilla's prior arrest for assaulting her younger brother, Dr. Watts explained that she was not very familiar with that conviction because Priscilla had little recall of the events leading up to it, but Dr. Watts did testify that she was unaware of any abuse by her brother against

20

Priscilla and that the assault could have occurred simply because Priscilla was intoxicated and got angry. After Dr. Watts finished testifying, Priscilla's younger brother, E.A., testified regarding the events that led to Priscilla's arrest and conviction for assault. In particular, E.A. explained that on the day of the assault, Priscilla was intoxicated, hit him multiple times, and ripped his shirt.

When expressly rejecting Priscilla's sudden-passion claim, the jury implicitly determined that the evidence regarding the events leading up to the offense, including the statement that Jimmie made to Priscilla immediately before the stabbing, did not establish the level of fear or rage needed to make a person of ordinary temperament lose control. In the issue discussed previously, we determined that the jury's rejection of Priscilla's self-defense claim was sufficiently supported by the evidence. Similarly, viewing the evidence presented during both portions of the trial in a neutral light and bearing in mind the jury's role in making credibility determinations and in deciding what weight to place on evidence and testimony presented, we cannot conclude that the jury's determination is against the great weight and preponderance of all of the evidence presented during the trial. *Matlock*, 392 S.W.3d at 671. Accordingly, we must conclude that the jury's determination that Priscilla did not kill Jimmie "under the immediate influence of sudden passion arising from an adequate cause" is supported by factually sufficient evidence. *See* Tex. Penal Code § 19.02(d).

For these reasons, we overrule Priscilla's second issue on appeal.

## CONCLUSION

Having overruled both of Priscilla's issues on appeal, we affirm the district court's judgment of conviction.

21

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed:   June 16, 2015

Do Not Publish